## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 05 2018, 8:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Brooke N. Russell<br>Indianapolis, Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana<br><br>Caryn N. Szyper<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| David Scott,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | April 5, 2018<br><br>Court of Appeals Case No.<br>49A05-1707-CR-1644<br><br>Appeal from the<br>Marion Superior Court<br><br>The Honorable<br>Lisa F. Borges, Judge<br><br>Trial Court Cause No.<br>49G04-1503-MR-8353 |

**Kirsch, Judge.**

[1] David Scott ("Scott") appeals his aggregate sixty-year executed sentence following his convictions for murder,[1] a felony, and aggravated battery,[2] a Level 3 felony. On appeal, Scott raises the following restated issues:

> I. Whether the trial court abused its discretion when it sentenced Scott to an executed sentence of sixty years; and

> II. Whether Scott's sentence is inappropriate in light of the nature of his offenses and his character.

[2] We affirm.

## Facts and Procedural History

[3] During the afternoon of March 8, 2015, Scott, Ian Buschmann ("Ian"), and Tyler Minix ("Tyler") were in Scott's Indianapolis apartment watching television and listening to music. Scott shared the three-bedroom apartment with his best friend, Jacob Spears ("Jacob"), and his childhood friend, Elise Rossano ("Elise"), who was Tyler's girlfriend. That afternoon, Scott, Ian, and Tyler all smoked marijuana at the apartment. Scott and Ian also used hallucinogenic mushrooms. A couple of hours later, Jacob returned home to the apartment with his girlfriend, Cierra Brown ("Cierra"). When Cierra learned that Scott and Ian had taken mushrooms, she went into Jacob's bedroom to do her homework. Jacob, however, stayed in the living room area.

---

[1] *See* Ind. Code § 35-42-1-1(1).

[2] *See* Ind. Code § 35-42-2-1.5.

As a reaction to the drugs Ian had consumed, he cried for much of the evening, and Jacob and Tyler tried to console him. Scott was acting a little irritated, but kept to himself and spent most of the evening in his bedroom.

[4] Around 10:00 p.m., Jacob convinced Ian that he needed food to reduce the effects of the mushrooms, so the two went into the kitchen to microwave some frozen pizza rolls, while Tyler went into Elise's bedroom. Meanwhile, Scott, still in his bedroom, retrieved his semi-automatic .40 caliber handgun from its case and walked into the living room area with the loaded firearm. Seeing Jacob and Ian in the kitchen, Scott pointed his gun and shot Jacob. As Jacob fell to the floor, he looked up and saw Scott holding a handgun. Seconds later, Scott shot Ian in the face, and Ian fell and landed on top of Jacob. The gunshot shattered Ian's jaw and perforated an artery in his neck, which caused Ian to bleed severely, and he almost immediately lost consciousness. *Tr. Vol. 2* at 170, 176-77. Jacob, who had been hit in the spine, remained conscious, but was instantly paralyzed. *Id*. at 101, 107. Jacob, unable to move his legs and with limited mobility in his arms, screamed for help and futilely tried to get out from under Ian. Although Scott remained nearby, he offered no aid to Jacob or Ian.

[5] Cierra, who was in Jacob's bedroom when she heard the two gunshots, opened the bedroom door and saw Scott facing her with a gun in his hand. Scott pointed the gun at Cierra and charged at her. Cierra screamed and frantically tried to close the bedroom door, while Scott tried to force his way into the room. Cierra fell to the floor, but was still able to close the door. Scott walked

away and looked briefly into Elise's bedroom; Tyler was out of sight hiding behind the door. Cierra called 911 from Jacob's bedroom closet.

[6] Tyler heard Jacob's repeated calls for help, and finally, he mustered up the courage to leave Elise's bedroom. In the kitchen, Tyler saw Ian on top of Jacob; Ian was not moving or breathing. Jacob was conscious and asked Tyler to pull him out from under Ian; Jacob said he "was drowning in [Ian's] blood basically from where it was coming out of his wound." *Id.* at 102. Tyler complied and dragged Jacob to the edge of the kitchen floor. Again, Scott did nothing to help; instead, he just stood near the kitchen.

[7] Tyler then walked outside to call 911. Neighbors, having heard the commotion, came to help, but found the apartment door locked. The neighbors, who could see Scott inside pacing back and forth from the kitchen to the living room, banged on the door and yelled to Scott to let them in. Scott "opened the door with a very deranged look on his face. It was more like a[n] evil smirk on his face." *Id.* at 146. Scott stared into the eyes of one of his neighbors and, with his hands up, said, "That's it. I'm going to jail." *Id.*

[8] Scott walked out of the apartment, down the stairs, and into the parking lot towards Indianapolis Metropolitan Police Department ("IMPD") Officer John Ly ("Officer Ly"), who had arrived on the scene. Scott told Officer Ly to "take [him] to jail." *Id.* at 208. Scott was arrested and placed in the back of a police car. IMPD Officer Jason Rauch, who spent time with Scott at the scene, later said he did not believe Scott was intoxicated at the time, and Scott admitted to

detectives that he was "sober" when he shot Jacob and Ian. *Id*. at 230; *Tr. Vol. 3* at 116, 125. Ian, who was twenty-five-years old at the time, died at the hospital that night.

[9] Back at the scene, IMPD officers searched Scott's apartment and found the gun on the floor just outside of the kitchen. The gun had an unfired round stuck in the chamber, which had jammed the firearm. Officers also found two fired casings and three unfired rounds on the floor of the apartment; one unfired round was left in the magazine. Police recovered the bullet that had penetrated Jacob's neck and exited through his shoulder from the closet of a neighboring apartment. The second fired bullet was recovered from Ian's body during his autopsy.

[10] On March 10, 2015, the State charged Scott with Count I, murder, and Count II, Level 1 felony attempted murder. Scott was tried to a jury in 2017 and was found guilty of murder. The jury, however, was unable to reach a verdict on the attempted murder charge. On May 31, 2017, the State amended the charging information to add Count III, Level 3 felony aggravated battery, for the purpose of carrying out a plea agreement in which Scott pleaded guilty to the Count III aggravated battery charge in exchange for dismissal of the Count II attempted murder charge. The plea agreement imposed a sentencing cap of sixty years for the murder and aggravated battery convictions, and it required Scott's sentences for the two convictions to be served concurrently. Otherwise, sentencing was left to the trial court's discretion. At the sentencing hearing, the trial court noted (1) Scott's "history of illegal substance abuse"; (2) "that the

harm suffered by the victims -- the victim of the aggravated battery -- certainly is much greater than was necessary in order to meet the elements of the offense"; and (3) "there are multiple victims here and the law allows the imposition of a separate sentence for each of those victims." *Tr. Vol. 3* at 244, 245. On May 31, 2017, the trial court sentenced Scott to sixty years executed for murder and fourteen years executed for Level 3 felony aggravated battery, to be served concurrently. The trial court granted Scott's motion for permission to file a belated appeal. Scott now appeals.

## Discussion and Decision

## I. Sentencing Discretion

[11] Scott challenges the trial court's treatment of aggravating factors during sentencing. As a preliminary matter, we observe that Scott appears to challenge only the portion of his sentence attributable to murder. However, as this court recently reiterated, "[A] defendant may not limit our review of his sentence by merely challenging an individual sentence within a single order that includes multiple sentences." *Moyer v. State*, 83 N.E.3d 136, 140 (Ind. Ct. App. 2017) (citing *Webb v. State*, 941 N.E.2d 1082, 1087 (Ind. Ct. App. 2011), *trans. denied*), *trans. denied*. Here, the trial court sentenced Scott to an aggregate sentence of sixty years for two crimes, one that left a friend dead and the other that left a friend paralyzed.

[12] Sentencing decisions lie within the sound discretion of the trial court. *Forshee v. State*, 56 N.E.3d 1182, 1185 (Ind. Ct. App. 2016). "After a court has

pronounced a sentence for a felony conviction, the court shall issue a statement of the court's reasons for selecting the sentence that it imposes unless the court imposes the advisory sentence for the felony." Ind. Code § 35-38-1-1.3. "So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion." *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on other grounds on reh'g*, 875 N.E.2d 218 (Ind. 2007). "An abuse of discretion occurs if the decision is 'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id*. (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)).

[13] On appeal, a trial court may be found to have abused its discretion by not entering a sentencing statement at all; entering a sentencing statement that explains its reasons for imposing a sentence where such reasons are not supported by the record or are improper as a matter of law; or entering a sentencing statement that omits reasons that are clearly supported by the record and advanced for consideration. *Id*. at 490-91. "Under those circumstances, remand for resentencing may be the appropriate remedy if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id*. at 491.

[14] During sentencing, the trial court set forth several aggravating factors, including Scott's "history of illegal substance abuse, and the fact that there are "multiple victims here and the law allows the imposition of a separate sentence for each of those victims." *Tr. Vol. 3* at 245. Scott argues that the trial court also applied

an improper aggravator—i.e., it considered that the harm, injury, loss, or damage suffered by the victim was significant and greater than the elements necessary to prove the commission of the offenses (hereafter referred to as "the significant harm aggravator"). Scott conceded during his sentencing hearing that the significant harm aggravator was appropriate for enhancement of the aggravated battery sentence, *Tr. Vol. 3* at 239, since the injury of being paralyzed is greater that the proof necessary to prove aggravated battery, but he argues on appeal that it is an inappropriate consideration to enhance the murder sentence.

[15] Here, assuming solely for the sake of argument that the trial court improperly considered the significant harm aggravator while sentencing Scott for murder, we find no error. "'A single aggravating circumstance may be sufficient to enhance a sentence. When a trial court improperly applies an aggravator but other valid aggravating circumstances exist, a sentence enhancement may still be upheld.'" *Baumholser v. State*, 62 N.E.3d 411, 417 (Ind. Ct. App. 2016) (quoting *Hackett v. State*, 716 N.E.2d 1273, 1278 (Ind. 1999)), *trans. denied*. While Scott challenges the use of the significant harm aggravator, he does not challenge the trial court's findings regarding the remaining aggravating factors. Scott had a "history of illegal substance abuse," and there were "multiple victims here and the law allows the imposition of a separate sentence for each of those victims." *Tr. Vol. 3* at 245. Based on the evidence before the trial court, we cannot say that the trial court abused its discretion by imposing a

sixty-year sentence as punishment for Scott's crimes, which left one friend dead and another friend paralyzed.

## II.  Whether the Sentence is Inappropriate

[16]     Scott asserts that his sentence is inappropriate in light of the nature of the offense and the character of the offender.  "The Indiana Constitution authorizes appellate review and revision of a trial court's sentencing decision." *Robinson v. State*, 91 N.E.3d 574, 577 (Ind. 2018).  "This authority is implemented through Indiana Appellate Rule 7(B), which permits an appellate court to revise a sentence if, after due consideration of the trial court's decision, the sentence is found to be inappropriate in light of the nature of the offense and the character of the offender." *Id*.  The principal role of such review is to attempt to leaven the outliers.  *Id*. (citing *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)).  An appellant may challenge his sentence on this basis even if the trial court has entered a proper sentencing statement that is supported by the record. *Anglemyer*, 868 N.E.2d at 491.

[17]     "Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment 'should receive considerable deference.'" *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017) (quoting *Cardwell*, 895 N.E.2d at 1222), *trans. denied*.  Whether we regard a sentence as inappropriate turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224.

"The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate." *Sanders*, 71 N.E.3d at 844.

[18] In sentencing, "[d]eference to the trial court 'prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character).'" *Id*. (quoting *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015)). "However, 'a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review.'" *Id*. (quoting *Roush v. State*, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007)).

[19] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Sanders*, 71 N.E.3d at 844. The sentence for murder is a fixed term of between forty-five and sixty-five years, with an advisory sentence of fifty-five years. Ind. Code § 35-50-2-3. The sentence for a Level 3 felony is a fixed term of between three and sixteen years, with an advisory sentence of nine years. Ind. Code § 35-50-2-5(b). We also assess the trial court's recognition or nonrecognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate. *Sanders*, 71 N.E.3d at 844.

[20] Under the plea agreement in the present case, the State agreed to dismiss the attempted murder count. The State also agreed to limit the trial court's sentencing discretion by providing that Scott's two sentences would run

concurrently and that his total sentence would be capped at sixty years. *Appellant's App*. at 38. The trial court sentenced Scott to sixty years for murder and a concurrent fourteen years for Level 3 felony aggravated battery, for an aggregate executed sentence of sixty years. Scott was sentenced within the statutory ranges and within the terms of the plea agreement. Scott's aggregate sentence for both crimes was only five years more than the advisory sentence just for murder.

[21] Regarding the nature of his offenses, Scott argues that, on the night in question, he decided "to clean his gun, a gun that he had never used before and was not very knowledgeable in, and it discharged and hit his friends." *Appellant's Br*. at 12. He contends that while the death of his friend Ian was tragic, "there was *nothing in the record* to support that the nature of the offense was any more deserving of an aggravated sentence than the advisory sentence contemplates." *Id*. (emphasis added). Scott's argument, however, ignores the evidence at trial. Witnesses testified that Scott walked from his bedroom toward the kitchen and, without saying anything, shot his best friend, Jacob, and then shot another friend, Ian. *Tr. Vol. 2* at 100-02. Jacob fell first, and Ian fell on top of him. Jacob said he was drowning in Ian's blood. *Id*. at 102. After being shot, Jacob remained conscious, but was instantly and permanently paralyzed. *Id*. at 101, 107. Notwithstanding Jacob's pleas for help, Scott did nothing to help either Ian or Jacob. *Id*. at 107, 151. Moreover, after shooting Ian and Jacob, Scott pointed the gun at Cierra and charged at her. *Id*. at 23-26, 103. Cierra managed to get the bedroom door closed before Scott could enter. *Id*. at 23, 60-

61. A next-door neighbor, who heard the commotion and came to help, testified that Scott "opened the door with a very deranged look on his face. It was more like a[n] evil smirk on his face." *Id*. at 146. In light of the nature of the offenses, a sixty-year-executed sentence is not inappropriate.

[22] As to his character, Scott has no criminal history; yet he admitted that he smoked marijuana and took hallucinogenic mushrooms on the day in question. Furthermore, Scott does not challenge the trial court's conclusion that Scott "does have a history of illegal substance abuse even though he denies that in his pre-sentence investigation." *Tr. Vol. 3* at 244-45. Notwithstanding his relatively young age of twenty-one years old, we agree with the trial court that "certainly you are an adult at eighteen and an adult in every sense of the word at twenty-one." *Id*. at 245. Scott's mental health conditions of depression, anxiety, and paranoia also provide no support for imposition of a lesser sentence. As the trial court found, "There was nothing to suggest that [Scott] had a mental illness that affected his ability to perceive events, his ability to form intent, none of those things had an impact." *Id*. Based on the evidence before the trial court, we cannot say that an aggregate sentence of sixty years as punishment for Scott's crimes that left one friend dead and another friend paralyzed is inappropriate in light of the nature of Scott's offenses and his character.

[23] Affirmed.

[24] Baker, J., and Bradford, J., concur.